IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

AMBE ASHENAFI WODESSO,

       Defendant.

Case No. CR10-0010

REPORT AND RECOMMENDATION

---

**TABLE OF CONTENTS**

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.*   *Outside the Airport Terminal* . . . . . . . . . . . . . . . . . . . . . . . 2
    *B.*   *Inside the Airport Terminal* . . . . . . . . . . . . . . . . . . . . . . . . 4
    *C.*   *In the TSA Office* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    *D.*   *At the ICE Office* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *E.*   *At the Linn County Jail* . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   **ISSUES PRESENTED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    *A.*   *Was Defendant Seized Unlawfully?* . . . . . . . . . . . . . . . . . . . 9
        *1.*   *Initial Contact with Defendant* . . . . . . . . . . . . . . . . . 10
        *2.*   *Moving the Activity Inside* . . . . . . . . . . . . . . . . . . . 12
        *3.*   *Reasonable suspicion* . . . . . . . . . . . . . . . . . . . . . . 13
    *B.*   *Are the Search and Defendant's Statements Tainted by the*
        *Unlawful Seizure?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *1.*   *The Search of Defendant's Bags* . . . . . . . . . . . . . . . . 15
        *2.*   *Defendant's Mirandized Statements* . . . . . . . . . . . . . . 18
    *C.*   *Did Defendant Voluntarily Consent to a Search?* . . . . . . . . . . . 20

VI.   **SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.  **RECOMMENDATION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# I. INTRODUCTION

On the 10th day of March, 2010, this matter came on for hearing on the Motion to Suppress (docket number 9) filed by the Defendant on March 2, 2010. The Government was represented by Assistant United States Attorney Richard L. Murphy. Defendant Ambe Ashenafi Wodesso appeared personally and was represented by his attorney, Raphael M. Scheetz.

# II. PROCEDURAL HISTORY

On February 2, 2010, Defendant was charged by Indictment (docket number 1) in four counts.[1] Count 1 charges possession of marijuana. Count 2 charges possession of "a reasonable facsimile of the seal of the Department of Defense" with fraudulent intent. Count 3 charged Defendant with falsely claiming that he had been a member of the military.[2] Count 4 charges the Defendant with falsely stating that he has not used a letter bearing the Department of Defense seal for fraudulent purposes. Defendant entered a plea of not guilty, and trial is scheduled before Chief Judge Linda R. Reade on April 5, 2010.

On March 2, 2010, Defendant timely filed the instant motion to suppress. The matter was submitted to the undersigned Magistrate Judge for a report and recommendation to the district court.

# III. RELEVANT FACTS

## A. Outside the Airport Terminal

On January 14, 2010, agents with Immigration and Customs Enforcement ("ICE") were conducting a VIPR operation at the Eastern Iowa Airport, near Cedar Rapids.[3] The operation was intended to provide "enhanced security" at the airport, and to show an increased law enforcement presence at the airport. Included in the operation were ICE

---

[1] Defendant was initially charged by criminal complaint on January 15, 2010. *See United States v. Ambe Ashenafi Wodesso*, No. 1:10-mj-00005-JSS (N.D. Ia.).

[2] On March 12, 2010, the Court granted the Government's motion to dismiss Count 3. *See* docket numbers 17 and 18.

[3] VIPR is an acronym for "Visible Intermodal Prevention and Response."

Special Agents Christopher Cantrell, Karsten Anderson, and Andrew Lund; and ICE Task Force Officer Jeff Tilson.

During the early afternoon of January 14, all four officers were standing on an outside covered walkway, located immediately east of the terminal.[4] There is a bus stop for Interstate buses at that location. At approximately 2:15 p.m., the officers observed Defendant Ambe Ashenafi Wodesso get off a Trailways bus. Defendant retrieved his baggage from under the bus and laid it down near where Special Agents Anderson and Lund were standing.[5] Defendant then crossed the 15-foot walkway to speak with a taxi driver.[6] After speaking with the taxi driver, Defendant was approached by Special Agent Cantrell, accompanied by Task Force Officer Tilson.

Special Agent Cantrell testified that his attention was drawn to Defendant by his attire. Specifically, Defendant was wearing a Pittsburgh Pirates baseball cap. Rather than bearing the traditional team colors of black and yellow, however, the hat was black, with a red "P" in the front.[7] Defendant was also wearing sneakers with red shoelaces.[8] Cantrell testified that based on his training and experience, wearing sports gear in non-traditional colors, or wearing colored shoelaces, may be an indicator of gang affiliation.[9]

Upon approaching Defendant, Special Agent Cantrell displayed his badge and credentials, which were contained in a wallet which Cantrell removed from his pocket.

---

[4] A diagram of the terminal and walkway is found on page 1 of Government's Exhibit 7.

[5] The locations of Special Agents Anderson and Lund are designated on the exhibit with a "B" and "L."

[6] The location of the taxi is shown on Exhibit 7 by a rectangle with a "T" inside.

[7] A hat similar to the one being worn by Defendant on that date was introduced as Defendant's Exhibit D.

[8] A photograph of the sneakers was introduced as Defendant's Exhibit B.

[9] Cantrell testified at some length regarding his extensive training and experience with gang investigations.

Cantrell also wears a badge and a firearm on his belt, but they were concealed by his shirt hanging over them. Cantrell specifically denied displaying his weapon at that time.

Special Agent Cantrell asked Defendant for identification, and he produced a Minnesota driver's license. Cantrell asked Defendant about gang affiliation, and Defendant denied any involvement in gangs. When asked where he was born, Defendant replied "east Africa." Defendant also admitted that he had a criminal record. It was cold and windy outside, and Cantrell then asked Defendant to accompany him inside the terminal. Special Agent Anderson recalled that Cantrell lightly touched Defendant on the shoulder as they proceeded inside.[10]

### B.  Inside the Airport Terminal

Defendant and the four ICE agents then moved inside the terminal, near the baggage claim area, immediately adjacent to the outside walkway.[11] Special Agent Cantrell was primarily involved in questioning Defendant, with Special Agent Anderson and Task Force Officer Tilson nearby. Special Agent Lund was located five to ten feet away, and involved in calling "dispatch" to check on Defendant's immigration status and any outstanding arrest warrants.[12] After going inside, Cantrell tucked his shirt in behind his holster, thereby displaying both his badge and his weapon. According to Cantrell, he did so to alert passersby that a "law enforcement encounter" was taking place. While the other ICE agents did not display their weapons, Anderson testified that it was "apparent" that they were with Cantrell.

---

[10] Cantrell denied touching Defendant when accompanying him inside the building.

[11] The location inside the terminal is identified with a "C" on page 2 of Government's Exhibit 7.

[12] At that point, Lund had Defendant's driver's license and his permanent resident alien card (Form I-551), commonly called a "green card." The testimony was imprecise, however, regarding when the green card was produced by Defendant. Initially, Cantrell testified that Defendant was asked to produce his "immigration document" after they went inside. On cross-examination, however, Cantrell could not recall if Defendant's green card was produced before or after the activity was moved inside. Lund testified that he was given both documents by Cantrell, but could not recall whether that was outside on the walkway or inside near the baggage claim area.

After moving inside, Cantrell again questioned Defendant about possible gang affiliation and his criminal history. Cantrell asked if he could see Defendant's tattoos. Defendant took off his coat and pushed up the sleeves of his long-sleeve shirt, displaying tattoos on his forearms. On one forearm, Defendant has a tattoo which states:

> "THE STRUGGLE OF THE OROMO PEOPLE IS AN ATTEMPT TO AFFIRM THEIR OWN PLACE IN HISTORY. IT SEEKS EQUALITY, HUMAN DIGNITY, DEMOCRACY, FREEDOM & PEACE. IT IS NOT DIRECTED AGAINST THE MASS OF A PARTICULAR NATION, NOR NATIONALITY, NOR AGAINST INDIVIDUALS, BUT RATHER AGAINST ETHIOPIAN COLONIALISM!"

Photographs of the tattoo are found on pages 1 and 2 of Government's Exhibit 8. Cantrell testified that he grabbed Defendant's wrist in order to read the entire tattoo. Defendant's other forearm also bears a fairly lengthy tattoo which is somewhat difficult to read, but appears to be a tribute to his mother.[13]

Special Agent Cantrell asked Defendant if there was "anything illegal" in his luggage, and Defendant answered there was not. Cantrell then asked "if we could look." Although he could not recall Defendant's precise words, Cantrell testified that Defendant consented to the search. Special Agent Anderson testified that he was standing nearby and also heard Defendant consent to the search. According to Cantrell, Defendant's consent to search his bags came within five minutes, "more or less," of the initial encounter. Anderson estimated the time from the initial contact to the search at "ten minutes or less."

Special Agent Anderson looked inside a "gym bag" and found a smaller bag. When he opened the smaller bag, he found a plastic baggie containing what appeared to be marijuana.[14] After finding the marijuana, Anderson immediately placed Defendant in handcuffs and advised Special Agent Cantrell of the contraband. The bags were then

---

[13] Photographs of the second tattoo can be found on pages 5 and 6 of Government's Exhibit 8.

[14] A photograph of the baggie containing marijuana was introduced as Government's Exhibit 6.

closed and Defendant was taken to a Transportation Security Administration ("TSA") office in the airport terminal.

### C. In the TSA Office

After being removed to the TSA office, Defendant was questioned further.[15] Defendant was asked to remove his long-sleeve shirt so the agents could inspect his other tattoos. Defendant has an extensive tattoo on his upper arm, although it is difficult for the Court to determine what it says.[16] Apparently, Defendant was also required to remove his tank-top undershirt, so the agents could determine whether he had any tattoos on his torso.

A more thorough search of Defendant's belongings continued in the TSA office. Two marijuana cigars, or "blunts," were found in Defendant's coat.[17] Also found was a letter, ostensibly bearing the seal of the Department of Defense, which represented that Defendant had been deployed to Afghanistan with the United States military. Agents also found documents suggesting Defendant had used the letter in various schemes to defraud Wells Fargo and others. Agents also found a flag of the Oromo Liberation Front.[18]

Defendant was then transported to the ICE office in Cedar Rapids. Special Agent Cantrell testified that he wanted to take Defendant's fingerprints to confirm his identity and verify his criminal record. Cantrell estimated that the time from his initial encounter with Defendant to the time when they left for the ICE office was approximately 30 to 45 minutes. Special Agent Anderson opined that the time spent in the TSA office was 30 to 45 minutes.

---

[15] It was in the TSA office that Defendant allegedly made a false statement that he had been a member of the military. Defendant was clearly in custody at that time, however, and was not given a *Miranda* warning. The Government apparently concedes that any statements made by Defendant in the TSA office are inadmissible, and Count 3 of the Indictment was dismissed on the Government's motion. *See* docket numbers 17 and 18.

[16] Photographs of the tattoo are found on pages 3 and 4 of Government's Exhibit 8.

[17] These blunts are pictured in a photograph introduced as Government's Exhibit 6.

[18] Special Agent Cantrell testified that he later learned that the Oromo Liberation Front has been designated as a terrorist organization by the Ethiopian government.

### D.  At the ICE Office

While a precise record was apparently not made, it appears likely that Defendant arrived at the ICE office between 3:15 and 3:30 p.m.  There was an "intake process," which Special Agent Anderson estimated takes 15 to 20 minutes.  Defendant then waited in the "temporary processing room," accompanied by an ICE agent at all times, until he was interviewed by ICE Special Agent Eric Spaulding, approximately three hours later.  In the interim, agents were gathering additional intelligence regarding Defendant's possible military service, his criminal record, his immigration status, the Oromo Liberation Front, and other matters.

According to Special Agent Spaulding, the room where Defendant was detained is approximately 10 feet wide and 20 feet long.[19]  It contains  various desks, four computer monitors, photocopying equipment, and fingerprinting equipment.  When questioning Defendant, Spaulding sat on the opposite side of a "buffet table."  Spaulding described the area as "close quarters."

Prior to any questioning, Special Agent Spaulding presented Defendant with a *Miranda* "STATEMENT OF RIGHTS."  *See* Government's Exhibit 1.  Defendant was asked to read the statement out loud, and he complied.  Defendant then signed the "WAIVER" found on the bottom of the form, and agreed to speak with Spaulding.[20]

Special Agent Spaulding's questioning of Defendant began at approximately 6:20 p.m. on January 14, 2010.  The first session lasted approximately one and one-half hours.  According to Spaulding, subsequent sessions did not last more than one hour.  Breaks were taken between the sessions, with some breaks lasting longer than others.  The formal questioning ended at approximately 12:10 a.m. on January 15, but Spaulding asked some follow-up questions while Defendant was being readied for transport to the Linn

---

[19] Special Agent Cantrell estimated that the room was 8-10 feet wide and 14 feet long.

[20] The waiver was signed by Defendant, and witnessed by Special Agent Spaulding and Special Agent Ed Hurkett of the Federal Bureau of Investigation ("FBI"), who also sat in on the interrogation.

County jail.  Questioning finally ceased at approximately 12:30 a.m.  The interview spanned approximately six hours, but Spaulding testified that there were "at least four" breaks, with the actual questioning taking four to four and one-half hours.

According to Special Agent Spaulding, Defendant was taken to the restroom at least twice.  Defendant was never refused bathroom privileges.  Defendant was given at least two sodas and at approximately 10:00 p.m. was given food from Taco Bell.  According to Spaulding, an agent retrieved a bag of assorted food from Taco Bell, with Defendant and the agents then eating from that bag.

Special Agent Spaulding testified that Defendant was "lucid and willing to discuss" the questions put to him.  Defendant said that he was four credits short of earning an AA degree, and a transcript in his possession supported that statement.  Defendant did not show any indication of being under the influence of drugs or alcohol.  Defendant never asked that the questioning cease and did not ask to speak to an attorney.  When asked on cross-examination whether Defendant had asked to make a telephone call, Spaulding responded "I think so, but I don't have a specific recollection of it."  Spaulding conceded that "it's possible" that Defendant asked three or four times to make a phone call. Spaulding acknowledged that Defendant was not permitted to make any calls.

Special Agent Spaulding conceded that Defendant was handcuffed "for at least a portion of the time" while he was being interviewed.  When asked on cross-examination whether Defendant was handcuffed at all times except when he was fingerprinted, Spaulding responded that he "can't say."  There was no audio or video recording made of the interview.  Defendant was taken to the Linn County jail and "booked in" by about 1:30 a.m. on January 15.

### E.  At the Linn County Jail

ICE Special Agent Eric Spaulding and FBI Special Agent Ed Hurkett interviewed Defendant later that morning at the Linn County jail.  Defendant was given a *Miranda* warning, and signed a written waiver at 11:15 a.m.  *See* Government's Exhibit 2.  The

initial questioning on January 15 lasted only a short time, however, because the prisoners were being fed lunch. Spaulding and Hurkett returned to the jail and resumed the questioning at approximately 1:20 p.m. Defendant was again given a *Miranda* warning and signed the written waiver, using the same form that was used in the morning. *See* Government's Exhibit 2. The second session lasted "no more than an hour."

Defendant was then transported to the United States District Court for the Northern District of Iowa for an initial appearance on the Criminal Complaint.[21] During the interviews on January 15, Defendant was not told that criminal charges were imminent.

## IV. ISSUES PRESENTED

After getting off a bus at the Eastern Iowa Airport, Defendant was found in possession of marijuana and a forged letter which falsely stated that he had been deployed with the United States military in Afghanistan. In a subsequent *Mirandized* statement, Defendant allegedly lied to the agent when he denied using the letter for fraudulent purposes.

In his motion to suppress, Defendant asks that the Court suppress any evidence regarding items seized from his person or property. Defendant also asks that the Court suppress any statements made by him.

In support of his request, Defendant argues that (1) he was seized without reasonable suspicion, (2) his subsequent consent to search and consent to answer questions after being *Mirandized* were tainted by his initial unlawful detention, and (3) his consent to search was not voluntary.

## V. DISCUSSION

### A. Was Defendant Seized Unlawfully?

Initially, Defendant argues that he was "seized" in violation of the Fourth Amendment. Defendant claims that he was seized by the ICE agents when his driver's

---

[21] *See United States v. Ambe Ashenafi Wodesso*, No. 1:10-mj-00005-JSS (N.D. Ia.), docket number 7.

license and green card were taken from him.  Defendant argues that the agents lacked "reasonable suspicion" to justify their actions.  The Government denies that a seizure occurred prior to finding marijuana in Defendant's bag, and does not address the issue of whether reasonable suspicion would have supported a seizure.

### 1.    *Initial Contact with Defendant*

The United States Constitution protects persons "against unreasonable searches and seizures."  U.S. CONST. amend. IV.  This Fourth Amendment protection applies to "seizures," even when the encounter does not "eventuate in a trip to the station house." *Terry v. Ohio*, 392 U.S. 1, 16 (1968).  As noted by the Court in *Terry*, however, the Court's "first task" is to determine "at what point in this encounter the Fourth Amendment becomes relevant."  *Id.*

The United States Supreme Court has stated repeatedly that a "seizure" does not occur when a law enforcement officer simply approaches an individual in public and asks questions.  *See, e.g.*, *United States v. Drayton*, 536 U.S. 194, 200 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen.").  A seizure does not occur if the contact remains consensual.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required.") (internal citation omitted).

> We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage – as long as the police do not convey a message that compliance with their requests is required.

*Bostick*, 501 U.S. at 434-35 (internal citations omitted).

Here, Special Agent Cantrell identified himself by producing his badge and credentials. Cantrell testified that the items were contained in a wallet which he removed from his pocket.[22] There is no evidence that Cantrell approached Defendant in a threatening manner, or that he raised his voice when asking Defendant for identification. While Cantrell was accompanied by Task Force Officer Tilson, the other two ICE special agents were approximately 15 feet away. "There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." *Dayton*, 536 U.S. at 204.

Defendant complied with Special Agent Cantrell's request that he provide identification. Defendant also responded to Cantrell's questions regarding possible gang affiliation, whether he was born in the United States, and prior criminal record. During that time, the encounter was consensual, did not constitute a "seizure," and did not trigger Fourth Amendment protection.[23] *Bostick*, 501 U.S. at 434 ("Since *Terry*, we have held repeatedly that mere police questioning does not constitute a seizure."). *See also United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.").

---

[22] Cantrell denied displaying the badge and firearm on his belt. Even if Defendant saw Cantrell's weapon, however, it would not alter the consensual nature of the encounter. *Drayton*, 536 U.S. at 205 ("That most law enforcement officers are armed is a fact well known to the public. The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.").

[23] "While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216 (1984).

## 2.  *Moving the Activity Inside*

After determining that Defendant was a foreign national and had a criminal record, Special Agent Cantrell decided to move the activity inside the terminal.  At Cantrell's request, Defendant accompanied the four ICE agents inside the terminal.  Special Agent Anderson recalled that Cantrell lightly touched Defendant on the shoulder as they proceeded inside.  The agents helped carry Defendant's luggage inside the terminal. Cantrell had Defendant's driver's license and, at about that time, Defendant also surrendered his green card to the ICE agents.  At that point, a reasonable person could conclude that he was no longer free to simply "walk away," or "go about his business." Cantrell found it appropriate to display his badge to alert passersby that a "law enforcement encounter" was taking place.  The agents' "show of authority," *Terry*, 392 U.S. at 19, n.16, conveyed a message that Defendant's compliance was required. *Bostick*, 501 U.S. at 435.  The Court concludes that Defendant was "seized" for Fourth Amendment purposes when he was directed to accompany the agents inside the terminal.

The Court is mindful that in *Mendenhall*, no "seizure" was found, despite the defendant being "asked" to accompany two DEA agents from an airport concourse to the DEA office located 50 feet away.  446 U.S. at 557-58.  I believe, however, that *Mendenhall* is distinguishable in a number of ways:  First, the defendant in *Mendenhall* was already in the airport terminal – having arrived on one plane and waiting for another plane.  Here, Defendant apparently had no intention of entering the terminal.  Second, and most importantly, the agents in *Mendenhall* returned the defendant's driver's license and airline ticket before asking that she accompany them to the office.  Here, the agents retained Defendant's driver's license and green card, thereby making it difficult for him to simply "walk away."  Third, there were only two agents in *Mendenhall*.  Here, when the activity was moved inside, Defendant was accompanied by four agents – some of whom were carrying his luggage.  Fourth, there is no evidence the defendant in *Mendenhall* was physically touched when she was asked to go to the DEA office.  Here,

Special Agent Cantrell "lightly touched" Defendant on the shoulder as they proceeded inside.[24]

### 3. Reasonable suspicion

The Fourth Amendment prohibits unreasonable seizures. To justify Defendant's "seizure" under these circumstances, the agents must have a reasonable, articulable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30. "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). The reasonable suspicion standard is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," but requires "at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* at 123-24.

Accordingly, the Court must examine the "totality of the circumstances" and determine whether the agents had a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). When Defendant was directed to go inside the terminal, the agents had the following information: (1) Defendant did not live in the area; (2) Defendant was wearing clothing which, based on the agents' training and experience, they believed may represent gang affiliation; (3) Defendant was not born in the United States; and (4) Defendant had a criminal record.

---

[24] In *United States v. Garcia*, 866 F.2d 147 (6th Cir. 1989), the Court discussed *Mendenhall* and its progeny. In attempting to reconcile the various cases, the Court concluded that "the one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place where the defendant had not planned to go." *Id.* at 151.

In making a reasonable suspicion determination, the agents are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).

Neither party cited any authority regarding the significance to be given a person possibly wearing "gang colors" when assessing "reasonable suspicion," and the Court has found none. Even if the red "P" on Defendant's hat and his red shoelaces showed a possible gang affiliation, however, it's unclear to the Court why that would suggest that criminal activity "is afoot." While the record is silent, one suspects that in larger cities, a significant number of young persons can be seen wearing "gang colors." Presumably, that fact alone does not establish reasonable suspicion to conduct a *Terry* stop.

It can hardly be considered suspicious that a person disembarking from an Interstate bus does not reside in the area. While the ICE agents testified that they found it "unusual" for Defendant to leave his bags on the curb while crossing the walkway to talk to the cab driver, the Court disagrees. Defendant had several bags and was only going about 15 feet. It is entirely understandable that Defendant would leave the bags on the curb nearest the bus while making inquiry of the cab driver.

The agents also knew that Defendant was foreign-born and had a criminal record. According to Special Agent Cantrell, a criminal conviction may affect a permanent resident alien's right to remain in this country. Nothing in the record suggests, however, that Cantrell had any information indicating Defendant was in the country illegally. While Cantrell had the right to question Defendant regarding matters affecting his immigration status in a consensual encounter, he could not "seize" Defendant for that purpose unless the *Terry* standard was met. *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216-17 (1984).

None of the facts known to the agents suggested that criminal activity was afoot. *Terry*, 392 U.S. at 30. Even when all of the facts and circumstances are considered

together, there was not a "particularized and objective basis for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273. Instead, I believe the agents acted on an "inchoate and unparticularized suspicion or hunch." *Wardlow*, 528 U.S. at 123-24. Accordingly, I conclude that Defendant's seizure inside the airport terminal was violative of the Fourth Amendment.

## B. Are the Search and Defendant's Statements Tainted by the Unlawful Seizure?

Next, Defendant argues that the search conducted inside the terminal, and his subsequent *Mirandized* statements, were tainted by the unlawful seizure and, therefore, are inadmissible at trial. If the district court concludes that Defendant was *not* "seized" during the encounter inside the airport terminal, then it is not necessary for the district court to address this issue. That is, if Defendant was not seized, then there can be no "taint," and the Court would proceed to Defendant's third argument (that his consent to search was not voluntary).

### 1.  The Search of Defendant's Bags

In support of his argument that the search was tainted, Defendant cites *United States v. Alvarez-Manzo*, 570 F.3d 1070 (8th Cir. 2009). There, Nebraska law enforcement authorities were "engaged in their usual routine of watching the passengers" at the Omaha Greyhound Bus Depot. *Id.* at 1071. After spotting a suspicious bag, officers boarded the bus with the bag and asked each passenger if the bag belonged to him. After the defendant responded "yes," he was asked to step off the bus so the officer could ask him some questions about the bag. When the defendant became visibly nervous and gave inconsistent responses, he was handcuffed and taken to the baggage room of the bus terminal. A drug dog was retrieved and he gave a positive indication for the presence of narcotics. The bag was transported to the sheriff's office and subjected to an ion scanner, which indicated the presence of heroin on the exterior of the bag. A search warrant was issued and a subsequent search revealed 10 kilograms of cocaine. *Id.* at 1073-74.

The district court granted the defendant's motion to suppress concluding, among other things, that the defendant "was seized on the bus in violation of the Fourth Amendment because [the officer] lacked reasonable suspicion." *Id.* at 1074. The district court concluded that "the unconstitutional seizure of Alvarez-Manzo and his bag tainted the subsequent search warrant such that the evidence obtained pursuant [to] it was inadmissible under the 'fruit of the poisonous tree' doctrine." *Id.* The Eighth Circuit Court of Appeals affirmed. The Court noted that the defendant's bag and person were unlawfully seized before the officer sought consent to search the defendant's wallet. "Thus, even if the consent to search was voluntary, standing alone, the evidence from the wallet still must be suppressed under the 'fruit of the poisonous tree" doctrine unless the consent was sufficient to purge the taint of the unlawful seizure of Alvarez-Manzo's bag and person." *Id.* at 1077. This legal principle was summarized by the Court as follows:

> In a "fruit of the poisonous tree" doctrine case, a constitutional violation has occurred, and the issue is whether law enforcement obtained evidence "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." "Voluntary consent to search, which was preceded by an illegal police action does not automatically purge the taint of an illegal seizure." Rather, to purge the taint, *i.e.* prevent the application of the "fruit of the poisonous tree" doctrine, the government bears the burden of demonstrating that the voluntary consent was an independent, lawful cause of the search. We determine whether this standard is met pursuant to the three factors elucidated in *Brown v. Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975), considering: (1) the temporal proximity between the Fourth Amendment violation and the grant of consent to search; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the officer's Fourth Amendment violation.

*Alvarez-Manzo,* 570 F.3d at 1077. (citations omitted).

Here, Defendant's consent to search followed almost immediately his unlawful seizure. After moving inside the terminal, Special Agent Cantrell continued to question

Defendant regarding possible gang affiliation and his criminal history. Cantrell also examined some of Defendant's tattoos. Cantrell then sought and obtained Defendant's consent to search his bags. Cantrell testified that the consent to search came within five minutes, "more or less," of the initial encounter. The consent to search came very shortly after the unlawful seizure and, therefore, there were no "intervening circumstances." While the Fourth Amendment violation cannot be considered "flagrant," the Court nonetheless concludes that under these circumstances, the Government cannot bear its "burden of demonstrating that the voluntary consent was an independent, lawful cause of the search." *Id*. Accordingly, the Court believes that the marijuana found as part of the consent search constitutes "fruit of the poisonous tree" and is inadmissible at trial.

The Court reached a similar result in *United States v. Eustaquio*, 198 F.3d 1068 (8th Cir. 1999). When the defendant arrived at the airport in Omaha, authorities observed her leave the plane and walk through the airport directly to a taxistand. Believing that the defendant "was acting 'as if she was forcing herself to appear relaxed,'" the officers approached her at the taxistand. *Id*. at 1069. When questioning the defendant, the officer saw what appeared to be a bulge under her shirt. The officer "'reflexively' reached out and poked the observed bulge with his finger, and asked what it was." *Id*. at 1070. After the defendant told the officer not to touch her, the officer instructed the defendant to accompany him to an interdiction office at the airport. After arriving at the office, the defendant consented to a search of her person. A package containing 500 grams of powder cocaine was found underneath her corset. *Id*.

In concluding that the evidence must be suppressed, the Eighth Circuit Court of Appeals found that even if no seizure occurred until the officer touched the defendant, the detention was not supported by articulable reasonable suspicion. *Id*. at 1071.[25] The Court

---

[25] In rejecting the government's argument that reasonable suspicion existed, the Court recounted the information known to the officers:

> The government offers the following as grounds for reasonable suspicion
> of criminal activity: (1) defendant's exhibiting nervous movement and a

(continued...)

concluded that the taint of the unlawful seizure was not removed, and the defendant's subsequent consent to search was "the fruit of the illegal detention." *Id.* at 1072. Similarly, Defendant's consent to search his bag in the instant action is "fruit" of his illegal seizure.

If Special Agent Cantrell had completed the records checks on the walkway and returned Defendant's driver's license and green card before asking permission to search, then there would be no seizure and the search would have been pursuant to Defendant's consent. By directing Defendant inside the terminal with a hand placed on his shoulder and without returning Defendant's documents, however, the search was tainted by the unlawful seizure.

### 2.    *Defendant's Mirandized Statements*

Furthermore, the Court concludes that Defendant's subsequent *Mirandized* statements were also "tainted." In determining whether the "fruit" of an illegal seizure is inadmissible, the controlling question is "whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). *See also United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a

---

[25](...continued)
straight-ahead gaze; (2) defendant's choice of a direct path to leave the terminal; (3) defendant's not having any checked luggage; (4) defendant's arrival from a source city for narcotics trafficking; (5) defendant's same-day purchase of a one-way airline ticket with cash; and (6) the fact that there were no friends and family meeting defendant at the airport. If we accept the government's argument that there was no detention until [the officer] touched defendant's midsection, the government gets the benefit of two additional factors supporting reasonable suspicion: (7) defendant's doing the opposite of what [the officer] asked, and pulling her shirt outward instead of toward her body; and (8) any bulge that [the officer] might have seen.

*Id.* at 1070-71.

result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

The evidence suggests that Defendant arrived at the ICE office approximately one hour after the initial encounter. Defendant's questioning was delayed by another three hours while the agents were gathering additional intelligence regarding Defendant's possible military service, his criminal record, his immigration status, the Oromo Liberation Front, and other matters. During that time, Defendant sat handcuffed in the "temporary processing room," accompanied by an ICE agent. While the record is somewhat imprecise, Defendant apparently made repeated requests to make a phone call, which were denied.

Prior to questioning, Defendant was given a *Miranda* warning, signed a written waiver, and agreed to speak to the investigating agent. A *Miranda* warning by itself, however, will not be held to attenuate the taint of an unconstitutional arrest. *Brown v. Illinois*, 422 U.S. 590, 602-03 (1975) ("Any incentive to avoid Fourth Amendment violations would be eviscerated by making the warnings, in effect, a 'cure-all,' and the constitutional guarantee against unlawful searches and seizures could be said to be reduced to 'a form of words.'"). In *Brown*, the defendant's first statement came less than two hours after his illegal arrest "and there was no intervening event of significance whatsoever." *Id.* at 604. The Court also found that Brown's second statement "was clearly the result and the fruit of the first." *Id.* at 605. In finding that Brown's statements were inadmissible, the Court distinguished the circumstances from that found in *Wong Sun*.

> The situation here is thus in dramatic contrast to that of Wong Sun himself. Wong Sun's confession, which the Court held admissible, came serveral [*sic*] days after the illegality, and was preceded by a lawful arraignment and a release from custody on his own recognizance.

422 U.S. at 605, n.11.

Here, Defendant's first statement came approximately four hours after he was seized without reasonable suspicion. There were no intervening events of significance. That is,

Defendant sat in the processing room at the ICE office without any outside contact. Like the facts in *Brown*, the situation here is similar to that of James Wah Toy in *Wong Sun*, rather than the situation of Wong Sun himself.[26] *See also Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (finding inadmissible statements made in close proximity to an unlawful seizure and without "any meaningful intervening event").

The Court also notes parenthetically that this case is distinguishable from *New York v. Harris*, 495 U.S. 14 (1990), and *United States v. Villa-Velazquez*, 282 F.3d 553 (8th Cir. 2002). In those cases, post-arrest information obtained following unlawful entry into the defendants' homes was found admissible because the officers had probable cause to arrest the defendants. Here, however, the probable cause to arrest Defendant came directly from the tainted search.

In summary, the Court believes that the search of Defendant's bags and his subsequent *Mirandized* statements are tainted by his seizure without reasonable suspicion. The search occurred almost immediately following his unlawful detention. The *Mirandized* statements followed a few hours later and without any significant "intervening circumstances." Accordingly, I believe the items seized from Defendant's property and his subsequent statements while in custody must be suppressed.

### C. Did Defendant Voluntarily Consent to a Search?

Finally, Defendant argues alternatively that if he was *not* seized at the airport terminal, the items seized from his person and luggage must nonetheless be suppressed because he "did not give a free and voluntary consent to search his person and belongings." *If* the district court concludes that Defendant was seized during the encounter inside the airport terminal and, therefore, the results of the search are inadmissible (as the undersigned Magistrate Judge has recommended above), then it is *not* necessary for the

---

[26] It is noteworthy that Defendant was seen by the Court for an initial appearance at 2:30 p.m. on January 15, 2010. When Special Agent Anderson approached Defendant at 5:00 p.m. on that date regarding consular notification, Defendant refused to sign the document without first talking to an attorney. *See* Government's Exhibit 4.

district court to address this issue. That is, the results of the tainted search would be inadmissible, even if Defendant voluntarily consented to the search. Nonetheless, I will address the consent issue in the event that the district court disagrees with my analysis set forth above.

The Fourth Amendment guards against unreasonable searches. Any warrantless search is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). A voluntary consent to search, however, is well-established as an exception to the warrant requirement. *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005). The law in this regard was summarized by the Court in *Sanders* as follows:

> The test applied to determine if consent is free and voluntary is whether, in light of the totality of the circumstances, consent was given without coercion, express or implied. The government bears the burden of showing consent was freely and voluntary [*sic*] given and not a result of duress or coercion, the burden cannot be discharged by showing mere acquiescence to a claim of lawful authority. "Rather, the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making."
>
> Factors we consider when determining if consent was freely and voluntarily given, as set forth in *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir.1990), include 1) age, 2) general intelligence and education, 3) whether the individual was under the influence of drugs or alcohol, 4) whether he was informed of his *Miranda* rights, and 5) whether he had experienced prior arrests and was thus aware of the protections the legal system affords suspected criminals.
>
> Additionally, the environment in which the alleged consent was secured is also relevant. Accordingly, we consider 1) the length of time one was detained, 2) whether the police threatened, physically intimidated, or punished the suspect, 3) whether the police made promises or misrepresentations, 4) whether the suspect was in custody or under arrest when the

consent was given, 5) whether the consent occurred in a public or a secluded place, and 6) whether the suspect stood by silently as the search occurred. We also consider "whether the defendant's contemporaneous reaction to the search was consistent with consent." "The factors should not be applied mechanically, and no single factor is dispositive or controlling."

424 F.3d at 773-74 (citations omitted).

Here, Defendant is an adult of at least average intelligence, and has nearly completed an AA degree. There is no evidence that Defendant was under the influence of any drugs or alcohol. While Defendant was not *Mirandized* prior to giving consent to search, he has had at least some prior experience with the American criminal justice system. Special Agent Cantrell's request to "look" in Defendant's baggage was made shortly after their initial encounter and in a public area. There is no indication that Defendant was threatened, or that the agents raised their voices or otherwise physically intimidated Defendant. No promises or misrepresentations were made to secure Defendant's consent. There is no indication that Defendant hesitated or otherwise qualified his consent to search. Based upon the totality of the circumstances, the Court believes that Defendant's consent to search his baggage was given freely and voluntarily, and was not the result of duress or coercion. Accordingly, I do not believe that the motion to suppress should be granted on Defendant's alternative argument.

*If* the district court concludes that Defendant was *not* seized during the encounter inside the airport terminal, then I believe his voluntary consent to search constitutes an exception to the warrant requirement. When the agents conducted the consent search, they found the marijuana almost immediately. At that point, probable cause existed to place Defendant in custody. Therefore, *if* Defendant was *not* "seized" when the search occurred, then the motion to suppress should be denied.

## VI.  SUMMARY

In summary, I believe the motion to suppress should be granted.  Special Agent Cantrell's initial contact with Defendant outside the airport terminal was consensual and, therefore, the Fourth Amendment was not implicated.  At some point, however, the encounter evolved into a "seizure" for Fourth Amendment purposes.  Defendant's driver's license and green card were taken from him, thereby making it difficult for him to "walk away" or "go about his business."  Cantrell placed his hand on Defendant's shoulder while directing him inside the airport terminal.  Once inside, Defendant was effectively surrounded by three ICE agents, with a fourth agent standing nearby.

In order to justify Defendant's seizure, the agents must have a reasonable suspicion that criminal activity is afoot.  That is, they must have a particularized and objective basis for suspecting legal wrongdoing.  Viewing the totality of the circumstances, and considering the specialized training and experience of the ICE agents, the Court nonetheless concludes that the standard first identified in *Terry* has not been met here.  In directing Defendant to go inside the terminal while depriving him of his driver's license and green card, the agents were acting on an "unparticularized suspicion" or hunch.  Since Defendant's consent to search was given immediately following the unlawful seizure, it is necessarily tainted by the seizure and the resulting "fruit" is inadmissible.  Defendant's subsequent *Mirandized* statements are similarly tainted.

However, I believe the motion to suppress turns on whether the district court concludes that Defendant was, in fact, "seized" during the encounter inside the airport terminal.  If Defendant was *not* seized inside the terminal, then I believe that the search of his baggage was conducted pursuant to a recognized exception to the warrant requirement.  That is, Defendant's voluntary consent to search resulted in the discovery of marijuana.  At that time, probable cause existed for Defendant's arrest.  Therefore, the results of the search and Defendant's *Mirandized* statements would be admissible.

## VII. RECOMMENDATION

For the reasons set forth above, the undersigned Magistrate Judge respectfully recommends that the district court **GRANT** the Motion to Suppress (docket number 9) filed by the Defendant on March 2, 2010.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the District Court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if either party is going to object to this Report and Recommendation, it must promptly order a transcript of the hearing held on March 10, 2010.*

DATED this 15th day of March, 2010.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA