**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 10-CR-10-LRR |
| vs. | **ORDER** |
| AMBE ASHENAFI WODESSO, | |
| Defendant. | |

_____

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *1*

II.   **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . *2*

III.  **STANDARD OF REVIEW** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

    A.   *Findings of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
    B.   *Conclusions of Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *5*
        1.   *Seizure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
            a.   *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*
            b.   *Application to facts* . . . . . . . . . . . . . . . . . . . . . . . . . *9*
                i.    *Movement inside the terminal* . . . . . . . . . . . . *10*
                ii.   *Retention of Defendant's documents* . . . . . . . *12*
                iii.  *Number of agents* . . . . . . . . . . . . . . . . . . . . *14*
                iv.   *Light touch* . . . . . . . . . . . . . . . . . . . . . . . . *14*
            c.   *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
        2.   *Reasonable suspicion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
            a.   *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . . . . *15*
            b.   *Application to facts* . . . . . . . . . . . . . . . . . . . . . . . . *16*
            c.   *Totality of the circumstances* . . . . . . . . . . . . . . . . *19*
        3.   *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

## I. INTRODUCTION

The matter before the court is the government's Objections (docket no. 26) to

United States Magistrate Judge Jon S. Scoles's Report and Recommendation (docket

19).  Judge Scoles recommends that the undersigned grant Defendant Ambe Ashenafi Wodesso's "Motion to Suppress" ("Motion") (docket no. 9).

## II. RELEVANT PROCEDURAL HISTORY

On February 2, 2010, a grand jury returned a four-count Indictment against Defendant.  Count 1 charges Defendant with Possession of Marijuana, in violation of 21 U.S.C. § 844(a). Count 2 charges Defendant with Possession of Facsimile of Seal of the Department of Defense with Fraudulent Intent, in violation of 18 U.S.C. § 506(a)(3). Count 3 charged Defendant with Making a Materially False, Fictitious, or Fraudulent Statement, in violation of 18 U.S.C. § 1001(a)(2).[1]  Count 4 also charges Defendant with Making a Materially False, Fictitious, or Fraudulent Statement, in violation of 18 U.S.C. § 1001(a)(2).

On March 2, 2010, Defendant filed the Motion.  On March 8, 2010, the government filed a Resistance (docket no. 13).  On March 10, 2010, Judge Scoles held a hearing ("Hearing") on the Motion.  Attorney Raphael Scheetz represented Defendant, who was personally present.  Assistant United States Attorney Richard Murphy represented the government.

On March 15, 2010, Judge Scoles filed the Report and Recommendation.  On March 31, 2010, the government filed its Objections.

## III. STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 29 U.S.C. § 636(b)(1); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003); *see also* Fed. R. Crim. P. 59(b)(3) (stating "[t]he district judge must

---

[1] On March 12, 2010, the court entered an Order (docket no. 18) granting the government's "Motion to Dismiss Count 3 of the Indictment" (docket no. 17).

consider de novo any objection to the magistrate judge's recommendation"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed R. Civ. P. 59(b)(3) (stating a district judge "may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions"). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the undersigned reviews the government's objections de novo.

## IV. ANALYSIS

The government makes several objections to Judge Scoles's findings of fact and conclusions of law. First, the undersigned shall consider the government's factual objections. Then, the undersigned shall address the government's legal objections.

### A. Findings of Fact

The government makes a number of objections to Judge Scoles's findings of fact. First, the government objects to Judge Scoles's findings of fact as to the events that occurred outside the terminal at the Eastern Iowa Airport. Second, the government objects to Judge Scoles's findings of fact concerning what occurred while inside the terminal. Third, the government objects to Judge Scoles's findings of fact concerning what occurred after the Immigration and Customs Enforcement ("ICE") agents took Defendant into custody.

The government asks the undersigned to make the following additional factual findings as to the events that occurred outside the terminal: (1) all of the ICE agents involved in the encounter were dressed in plain clothes; (2) throughout the encounter, none of the agents brandished a firearm, and all the agents concealed their firearms until after they moved the encounter inside the terminal; (3) many members of the public were present outside the airport and, prior to the agents identifying themselves to Defendant,

nothing about their appearance distinguished them from other members of the public; (4) Defendant placed his luggage at the feet of Agent Lund and Agent Anderson, which they considered odd; (5) Defendant's luggage included a suitcase, duffle bag, pillow and a box; (6) after Defendant spoke to a taxi driver, Agent Cantrell approached Defendant with Agent Tilson several feet behind him; (7) Agent Anderson and Agent Lund were in training; (8) no evidence was presented as to why Defendant spoke to the taxi driver; (9) Agent Cantrell was concerned because Defendant told him he had a criminal record; (10) federal law provides for the removal of certain aliens with criminal records; (11) Agent Lund and Agent Anderson were approximately fifteen feet away when Agent Cantrell was initially speaking to Defendant; (12) the distance from where the initial encounter took place to inside the airport is a short distance; (13) the agents asked Defendant to step inside the terminal because it was cold outside; (14) had Defendant left his luggage outside when the encounter moved inside the terminal, it would have been a security violation; (15) if Agent Cantrell touched Defendant, it was not forceful; and (16) only Agent Cantrell spoke to Defendant until Defendant was taken into custody.[2]

The undersigned has reviewed the record, including the Hearing transcript. The undersigned sustains the government's factual objections with respect to Agent Cantrell's touching of Defendant. The undersigned modifies the Report and Recommendations' factual findings to include the fact that, if Agent Cantrell touched Defendant, this touch was not forceful. Other than that fact, the undersigned finds that Judge Scoles's recitation of the facts is accurate, thorough and is more than adequate to resolve the legal objections put forth by the government. Even if the undersigned adopted the additional factual findings proposed by the government, these additional facts would have no impact on the

---

[2] The government also makes a factual objection to Judge Scoles's conclusion that Defendant was seized when the agents escorted him into the terminal and that his seizure was not supported by reasonable suspicion. The undersigned will address these objections in the discussion of Judge Scoles's legal conclusions.

resolution of the Objections. Accordingly, the remaining factual objections are overruled as moot.[3]

The government asks the undersigned to modify the Report and Recommendation to include additional facts concerning what occurred after the encounter moved inside the airport. The undersigned has considered the entire record and finds Judge Scoles's factual findings with respect to these events to be accurate. For the reasons stated in the analysis, the additional proposed findings do not affect the undersigned's legal analysis. Accordingly, the court shall overrule them as moot. Similarly, the government's objections to Judge Scoles's factual findings regarding the events after Defendant's arrest do not alter the undersigned's legal conclusions. Accordingly, the court shall overrule them as moot.

For the foregoing reasons, the undersigned adopts the Report and Recommendation's factual findings as modified. The government's objections to the Report and Recommendation's factual findings are sustained in part and modified in part.

### B. Conclusions of Law

The government makes two objections to Judge Scoles's conclusions of law. First, the government objects to Judge Scoles's finding "that [D]efendant was 'seized' for Fourth Amendment purposes, 'when he was directed to accompany the agents into the terminal.'" Objections at 12 (quoting Report and Recommendation at 12). Second, the government

---

[3] One of the facts that the government wants to add to the record is related to timing and it was already found by Judge Scoles. The government asserts that "the [Report and Recommendation] should also note that Agent Cantrell estimated that five minutes, '[m]aybe a little more, a little less' elapsed between the time [D]efendant was first approached by Agent Cantrell and the time Defendant consented to a search of his bags." Objections at 7. In the Report and Recommendation, Judge Scoles states that "Defendant's consent to search his bags came within five minutes, 'more or less,' of the initial encounter." Report and Recommendation at 5. Judge Scoles also points out that Agent Anderson "estimated the time from the initial contact to the search at 'ten minutes or less.'" *Id.*

objects to Judge Scoles's conclusion that no reasonable suspicion justified the seizure. The government does not object to Judge Scoles's findings that, if Defendant's seizure was unlawful, Defendant's consent to search his bags and subsequent *Mirandized* statements were the "fruit" of the unlawful seizure. Report and Recommendation at 23. Accordingly, if the undersigned finds that Defendant was seized without reasonable suspicion, the government agrees that the Motion should be granted.

### 1. Seizure

#### a. Applicable law

There are three categories of law enforcement encounters. *United States v. Johnson*, 326 F.3d 1018, 1021 (8th Cir. 2003). First, there are consensual encounters. *Id.* Consensual encounters are described as "communications between officers and citizens that are consensual and involve no coercion or restraint of liberty." *Id.* The Fourth Amendment does not apply to consensual encounters. *Id.* Second, there are *Terry* stops.[4] *Id.* *Terry* stops are "brief, minimally intrusive seizures which are considered significant enough to invoke Fourth Amendment safeguards and thus must be supported by a reasonable suspicion of criminal activity." *Id.* Third, there are custodial arrests, which "must be based on probable cause." *Id.*

In this case, the parties agree that Defendant's encounter with law enforcement began as a consensual encounter and ended as a custodial arrest. The issue is when, if ever, Defendant was seized by law enforcement officers such that the officers needed reasonable suspicion to conduct such a seizure. "In determining whether a person has been seized for Fourth Amendment purposes, the relevant question is whether, in view of the totality of circumstances surrounding the incident, a reasonable person would have believed he was free to leave." *Id.* (citing *INS v. Delgado*, 466 U.S. 210, 215 (1984)). No factor or set of factors exists which necessarily makes an encounter a seizure. *Id.*

---

[4] *Terry v. Ohio*, 392 U.S. 1 (1968).

However, the Supreme Court has identified factors which "inform the determination of whether a seizure took place." *Id.* at 1022. These factors include:

> officers positioning themselves in a way that limits the person's freedom of movement, presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication that the person is the focus of a particular investigation[.]

*Id.* (internal citation omitted).

In *United States v. Mendenhall*, the Supreme Court evaluated an encounter between the defendant and law enforcement at an airport. The Supreme Court ruled that the encounter did not constitute a seizure. *Mendenhall*, 446 U.S. 544, 555 (1980). In *Mendenhall*, two Drug Enforcement Agency ("DEA") agents approached the defendant as she was disembarking from an airplane. *Id.* at 547. After identifying themselves, the agents asked the defendant for identification and an airline ticket. *Id.* at 547-48. The agents then asked the defendant several questions. *Id.* at 548. After returning the defendant's documents to her, one of the agents asked the defendant "if she would accompany him to the airport DEA office for further questions." *Id.* The defendant complied with the request. *Id.* The Supreme Court determined that the defendant had not been seized:

> The events took place in the public concourse. The agents wore no uniforms and displayed no weapons. They did not summon [the defendant] to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand, to see the [defendant's] identification and ticket. Such conduct, without more, did not amount to an intrusion upon any constitutionally protected interest.

*Id.* at 555.

7

In *Florida v. Royer*, 460 U.S. 491 (1983), the Supreme Court evaluated another law enforcement encounter at an airport. In *Royer*, two detectives approached the defendant and asked "if [he] had a 'moment' to speak with them[.]" *Royer*, 460 U.S. at 494. The defendant complied with the detectives' request. *Id.* The defendant produced his driver's license and airline ticket. *Id.* "The detectives did not return his airline ticket and identification but asked [the defendant] to accompany them to a room, approximately forty feet away adjacent to the concourse." *Id.* Without verbally consenting, the defendant followed the officers to a room that "was later described by [one of the detectives] as a 'large storage closet.'" *Id.* One of the detectives used the defendant's baggage check stubs to retrieve his luggage. *Id.* The detective brought the luggage to the room and asked for consent to search it. *Id.*

The Supreme Court initially observed that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution of his voluntary answers to such questions." *Id.* at 497. The Supreme Court found that the defendant's encounter with law enforcement, however, went beyond a consensual encounter. *Id.* at 501. "[T]he officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases." *Id.* at 504. The Supreme Court explained, "by returning his ticket and driver's license, and informing him that he was free to go if he so desired, the officers may have obviated any claim that the encounter was anything but a consensual matter from start to finish." *Id.* In addition to the significance attached to retaining the defendant's identification and ticket, the Supreme Court noted that

> there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention . . . . There is no indication in this

case that such reasons prompted the officers to transfer the site of the encounter . . . to the interrogation room. It appears, rather, that the primary interest of the officers was not in having an extended conversation with [the defendant] but in the contents of his luggage, a matter which the officers did not pursue orally with [the defendant] until after the encounter was relocated to the police room.

*Id.* at 505.

### b.    *Application to facts*

The government objects to Judge Scoles's finding that the instant case is distinguishable from *Mendenhall*. Judge Scoles found *Mendenhall* distinguishable in the following ways:

First, the defendant in *Mendenhall* was already in the airport terminal—having arrived on one plane and waiting for another plane. Here, Defendant apparently had no intention of entering the terminal. Second, and most importantly, the agents in *Mendenhall* returned the defendant's driver's license and airline ticket before asking that she accompany them to the office. Here, the agents retained Defendant's driver's license and green card, thereby making it difficult for him to simply "walk away." Third, there were only two agents in *Mendenhall*. Here, when the activity moved inside, Defendant was accompanied by four agents—some of whom were carrying his luggage. Fourth, there is no evidence the defendant in *Mendenhall* was physically touched when she was asked to go to the DEA office. Here, Special Agent Cantrell "lightly touched" Defendant on the shoulder as they proceeded inside.

Report and Recommendation at 12-13.

The government objects to each of these distinguishing factors identified by Judge Scoles. The undersigned addresses each of them, in turn.

### i.    *Movement inside the terminal*

The government argues that the fact the encounter moved from outside to inside the terminal should carry little or no weight in the court's determination as to whether a seizure took place.  The government places significant weight on the fact that it was apparently cold outside and that the weather was the motivating factor for moving the encounter inside the terminal.[5]  In sum, the government argues that movement of a law enforcement encounter because of weather weighs against a finding of a seizure.  In support of its argument, the government cites a number of cases.  These cases are unpersuasive.

In *United States v. Manbeck*, 744 F.2d 360 (4th Cir. 1984), the issue was whether the defendants' placement in a squad car because of inclement weather heightened the encounter from a *Terry* stop to a custodial arrest.  The *Manbeck* defendants conceded that law enforcement had reasonable suspicion to conduct the *Terry* stop.  *Manbeck*, 744 F.2d at 375.  In the instant case, the issue is whether a consensual encounter became a *Terry* stop, not whether a properly-conducted *Terry* stop became a custodial arrest.  The other cases cited by the government analyze the same issue—whether a *Terry* stop became an arrest.  *United States v. Fields*, 178 F. App'x 890, 894 (11th Cir. 2006) (analyzing whether a *Terry* stop became custody); *See United States v. Lee*, 159 F. App'x 1, 6 (10th

---

[5] The undersigned finds that the weather was a factor for moving the encounter inside.  However, the record does not support a finding that the weather was the primary motivating factor for the move.  Agent Cantrell testified that he did not remember what the temperature was on that particular day, but that "it was cold."  Hearing Transcript ("Tr.") Volume I (docket no. 21), at 28.  Agent Cantrell never testified that the cold was the primary reason to move the encounter inside the terminal and Agent Cantrell initiated the move.  There is no evidence that the agents told Defendant that they wanted to move inside the airport to escape the elements.  Agent Anderson testified that Agent Cantrell suggested the move by saying, "why don't we go inside."  Tr. Volume II at 158.  When asked if "much of the reason for moving inside" was "to get out of the cold," Agent Anderson responded "[t]hat's true."  *Id.* at 156.

Cir. 2005) (analyzing whether the defendant was in custody); *United States v. Speal*, 166 F.3d 350 (10th Cir. 1998) (analyzing whether the defendant was in custody). In all of the cases cited by the government, law enforcement was justified in detaining the defendants, because reasonable suspicion supported the stops. During a consensual encounter, law enforcement may not detain an individual in any manner. Accordingly, these cases are unpersuasive in determining whether a consensual encounter became a *Terry* stop.

In deciding whether Defendant was seized, Judge Scoles cited *United States v. Garcia*, 866 F.2d 147 (6th Cir. 1989). In *Garcia*, the Sixth Circuit Court of Appeals explained that "the one occurrence which seems to distinguish 'seizures' from casual contacts between police and citizens is when the defendant is asked to accompany the police or agents to a place where the defendant had not planned to go." *Garcia*, 866 F.3d at 151. The government asks the undersigned to disregard *Garcia*, because "[t]here is simply no basis in the record to support the . . . proposed finding that [D]efendant[] 'apparently had no intention of entering the terminal.'" Objections at 20 (citing Report and Recommendation at 12). The government argues that it is "plausible that [D]efendant was asking [the cab driver outside the terminal] for directions to the restroom, airline ticket counter, restaurant, car rental counter, airport shuttle, or any other service located inside the terminal." Objections at 20. The undersigned agrees with the government that the record does not support a finding that Defendant did not intend to go inside the terminal. Accordingly, the undersigned shall not consider *Garcia* in its analysis of whether the Defendant was seized.

Next, the government argues that, instead of considering whether the law enforcement encounter moved from one place to another, the court should consider whether the encounter moved from a public to a private place. In support of this proposition, Defendant cites *Berkemer v. McCarty*, 468 U.S. 420 (1986). This case is distinguishable from the instant case. In *Berkemer*, the Supreme Court considered whether

a *Terry* stop became a custodial arrest. *Berkemer*, 468 U.S. at 441. Again, this is not helpful to the instant analysis of whether a consensual encounter became a *Terry* seizure. A *Terry* seizure authorizes a form of detention which a consensual encounter does not authorize.

The undersigned finds that the fact the encounter moved from outside the terminal to inside the terminal is a fact which distinguishes this case from *Mendenhall*. However, because of the weather and the other factors identified by the government, the undersigned finds that the move inside the terminal, by itself, does not carry significant weight in the seizure analysis.

### ii. *Retention of Defendant's documents*

The government argues that the agents' retention of Defendant's green card[6] and driver's license do not support a finding that a seizure occurred. The government asserts that there is nothing "in the record to suggest that[,] were [D]efendant to have requested the return of his identification documents or sought to go on his way[,] the law officers would not have complied with his requests." Objections at 28. Whether or not the agents would have returned Defendant's documents, if asked, is irrelevant to the analysis of whether he was seized. The Fourth Amendment does not place a burden on citizens to ask law enforcement officers to return identification documents.

In *Mendenhall*, the agents returned the defendant's documents before asking her to accompany them to the DEA office. *Mendenhall*, 446 U.S. at 548. After the agents returned her documents, a reasonable person would feel free to choose whether to comply with additional questioning. In this case, the agents acquired Defendant's driver's license

---

[6] A "green card" is the common name for Form I-551: Alien Registration Receipt Card. Its purposes are to "identify the bearer as a lawfully registered alien residing in the United States" and to "govern his activities and presence within this country." *United States v. Campos-Serrano*, 404 U.S. 293, 299-300 (1971).

before entering the terminal. The agents acquired his green card before or at about the same time that Agent Cantrell asked Defendant to step inside the terminal.

Persons "deprived of their . . . license are effectively deprived of the practical ability to terminate the questioning and leave." *United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir. 1988) (citing *Royer*, 460 U.S. at 501). In *Royer*, the Supreme Court placed significant weight on the fact that the detectives had possession of the defendant's documents when they asked him to move the encounter to another location. *Royer*, 460 U.S. at 504. The undersigned finds that this case is similar to *Royer* and notes that, "by returning [Defendant's green card and] driver's license, and informing him that he was free to go if he so desired, the [agents] may have obviated any claim that the encounter was anything but a consensual matter from start to finish." *Id.*

In addition to the concerns that all persons have concerning parting with their identifying documents, 8 U.S.C. § 1304 requires that a permanent resident "shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card[.]" 8 U.S.C. § 1304(e). "Any alien who fails to comply with [8 U.S.C. § 1304(e)] shall be guilty of a misdemeanor[.]" *Id.* Accordingly, the agents' retention of Defendant's green card made it particularly difficult for him to terminate the encounter. The undersigned also notes that Defendant is employed as a truck driver. Therefore, a driver's license is essential to Defendant's livelihood; again, making it particularly difficult for Defendant to terminate the encounter without his identifying documents. The undersigned finds that the fact agents retained Defendant's documents prior to or at the same time that Agent Cantrell asked him to move inside the terminal distinguishes this case from *Mendenhall*. Such retention weighs in favor of a seizure finding.

### iii.    *Number of agents*

The government argues that the number of officers present does not weigh in favor of a seizure finding.  The government asserts:

> [t]here is simply nothing in this record to support the position taken in the [Report and Recommendation] that the presence of multiple agents, dressed in plain clothes, who had not in any way identified themselves to defendant prior to defendant agreeing to move inside the airport, is a factor that should contribute to a finding that [D]efendant was 'seized' when he was asked to go inside the airport.

Objections at 30.  The government also argues that the presence of these officers did not create a "coercive" environment.  *Id.*

The number of agents present, in and of itself, is a factor to consider when determining whether a seizure has occurred.  *See Johnson*, 326 F.3d at 1022 (stating that "presence of several officers" is a factor to consider in a seizure analysis).  In *Mendenhall*, two agents initially approached the defendant.  In this case, a total of four agents walked into the terminal with Defendant.  Accordingly, the number of officers involved here is different than in *Mendenhall*.  However, the undersigned declines to give significant weight to this factor in the totality of the circumstances analysis.  Only Agent Cantrell had identified himself to Defendant at the time the encounter moved into the terminal.

### iv.    *Light touch*

The record is not entirely clear as to whether Agent Cantrell touched Defendant as they proceeded to the terminal.  If Agent Cantrell did touch Defendant, this fact weighs in favor of a seizure finding.  *See Johnson*, 326 F.3d at 1022 (stating that "physical touching" is a factor to be considered in a court's seizure analysis).  The undersigned notes that its analysis on the seizure issue would be the same whether or not Agent Cantrell touched Defendant.

### c.    Summary

For the foregoing reasons, the undersigned agrees with Judge Scoles's conclusion that the instant case is distinguishable from *Mendenhall*.  The primary distinguishing factor and the one upon which the undersigned most heavily relies is the retention of Defendant's documents.  After the agents took possession of Defendant's documents with no indication that  they would be returned to him immediately, a reasonable person would not feel free to leave.  Alternatively, even if Defendant was not seized at that point, the undersigned finds that he was seized before the agents asked to search his belongings.  After the encounter moved inside the airport, "[Agent] Cantrell found it appropriate to display his badge to alert passersby that a 'law enforcement encounter' was taking place."  Report and Recommendation at 12.  This show of authority coupled with the factors already discussed amounts to a seizure.  *See Terry*, 392 U.S. at 19, n. 16 (a "show of authority" may "restrain[] the liberty of a citizen" such that a "'seizure' has occurred").

### 2.    *Reasonable suspicion*

In light of the undersigned's finding that the consensual law enforcement encounter escalated to a *Terry* seizure, the undersigned must consider whether the seizure was supported by reasonable suspicion.

### a.    *Applicable law*

To authorize an investigative seizure, law enforcement must have "reasonable suspicion that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted).  Like seizure, there is no firm definition of what constitutes reasonable suspicion.  *Id.*  Reasonable suspicion is "something more than an inchoate and unparticularized suspicion or hunch." *Id.* (internal quotation marks omitted).  This "level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *Id.*  The court must evaluate the totality of the circumstances in its

determination of whether the agents had reasonable suspicion that Defendant may be engaging in criminal activity. *United States v. Gray*, 213 F.3d 998, 1001 (8th Cir. 2000).

### b.  *Application to facts*

The government argues that, "[a]t the time [D]efendant agreed to accompany Agent Cantrell inside the airport, [D]efendant's encounter was not only consensual, but was also supported by reasonable suspicion that would have justified an investigative detention." Objections at 36.  Judge Scoles discussed the facts known to the agents at the time the seizure occurred:

> (1) Defendant did not live in the area; (2) Defendant was wearing clothing which, based on the agents' training and experience, they believed may represent gang affiliation; (3) Defendant was not born in the United States; and (4) Defendant had a criminal record.

Report and Recommendation at 13.

The government asserts that additional facts should be considered in the court's reasonable suspicion analysis, including: "[D]efendant had a significant amount of personal belongings with him" and that "Defendant left his luggage at the feet of two strangers and walked away."  Objections at 41.  The government argues that these facts, coupled with those articulated by Judge Scoles, create a reasonable suspicion that Defendant may have been committing a number of offenses.

The first offense identified by the government is "failure to depart" as described by 8 U.S.C. § 1253.  Section 1253 makes it a crime for "[a]ny alien against whom a final order of removal is outstanding . . . [to] fail[] or refuse[] to depart from the United States . . . ." 8 U.S.C. § 1253(a)(1)(A).  The undersigned finds that the officers did not have reasonable suspicion that Defendant was committing this offense.  The government failed to provide authority to support the proposition that the facts above amount to a reasonable

suspicion that a final order of removal may have been outstanding against Defendant.[7]
Accordingly, the undersigned finds that the facts known to the agents at the time Defendant
was seized did not amount to a reasonable suspicion that a final order of removal was
outstanding against Defendant and that Defendant failed to take steps to depart the country.

The second offense listed by the government is the failure to have "personal
possession of registration or receipt card" as described by 8 U.S.C. § 1304. The fact that,
upon request, Defendant presented his green card, necessarily means that the agents could
not have had a reasonable suspicion that Defendant was committing this offense.

Third, the government states that "[i]t is a federal offense for an alien to: fail to
register as required; fail to timely notify the United States of any change in address;
procure an alien registration document through fraud; and for any person with fraudulent
intent to copy an alien registration receipt card." Objections at 39 (citing 8 U.S.C.
§ 1306). Nothing about the facts of this case gives rise to a reasonable suspicion that
Defendant was violating 8 U.S.C. § 1306. Presumably, the government contends that the
simple fact the agents knew that Defendant was born outside the United States gives rise
to reasonable suspicion that he may have been in violation of 8 U.S.C. § 1306. The
undersigned rejects this contention. This characteristic is common to countless individual
people and, therefore, does not amount to reasonable suspicion. *See United States v.*

---

[7] The court notes that, if a final order of removal was outstanding against
Defendant, it is possible that he may not have had a green card. Memorandum from U.S.
Immigration and Customs Enforcement Acting Director John P. Torres to All Field Office
Directors (July 14, 2006) (*available at*
http://www.aila.org/content/default.aspx?docid=24578) (stating that "[u]pon entry of an
administratively final order of removal, a [Legal Permanent Resident's] status terminates
and the temporary I-551 should be confiscated"). The fact that Defendant presented a
green card and consistent driver's license to the agents undermines the assertion that they
had reasonable suspicion that he was in violation of 8 U.S.C. § 1253.

*Eustaquio*, 198 F.3d 1068, 1071 (8th Cir. 1999) (stating that when "[t]oo many people fit [a] description[,]" it cannot "justify a reasonable suspicion of criminal activity").

Fourth, the government states that "[t]here are multiple federal crimes associated with the possession of false or fraudulent identity documents." Objections at 39. The undersigned finds that the agents did not have reasonable suspicion that Defendant was engaging in a false or fraudulent identity document crime. The simple fact that a foreign-born citizen with a criminal record presents an identification document to officers does not give rise to a reasonable suspicion that the identification document is false or fraudulent.

Finally, the government describes a number of statutes relating to deportability and inadmissability. Any person who is inadmissible or deportable "shall' be taken into custody." Objections at 39 (citing 8 U.S.C. § 1226(c)(1)). In order for law enforcement to seize an individual, however, they must have a reasonable suspicion that "*criminal activity is afoot.*" *Gray*, 213 F.3d at 1001 (emphasis added). The fact that an individual is deportable or inadmissible is not a criminal offense. *See United States v. Spector*, 343 U.S. 169, 176 (1952) (stating that the Supreme Court makes a "great distinction between deportation itself and a deportation order that may be made the basis of subsequent criminal punishment"). If a final order of removal has been entered against an individual, and the individual fails to depart the country, then the individual has committed a criminal offense. 8 U.S.C. § 1253(1)(A). The Fourth Amendment does not allow seizures based on reasonable suspicion that a legal permanent resident *may* be deportable if there is no reasonable suspicion of criminal activity. As stated by Judge Scoles, "[w]hile [Agent] Cantrell had the right to question Defendant regarding matters affecting his immigration status in a consensual encounter, he could not 'seize' Defendant for that purpose unless the *Terry* standard was met." Report and Recommendation at 14 (citing *Delgado*, 466 U.S. at 216-217).

### c.    *Totality of the Circumstances*

After considering the totality of the circumstances, the undersigned agrees with Judge Scoles's conclusion that the agents lacked reasonable suspicion to conduct the seizure. The fact that Defendant did not live in the area is not unusual, especially when disembarking from a bus at an airport. The fact that Defendant was wearing so-called "gang colors" also does not give rise to reasonable suspicion. The clothing worn by Defendant was common and could have been worn by any number of individuals. For the reasons articulated above, the fact that Defendant was foreign born and had a criminal record does not give rise to reasonable suspicion that criminal activity was afoot. Last, the undersigned finds that the two additional facts articulated by the government—Defendant had a significant amount of personal belongings and that he left them close to strangers—may be unusual, but they do not give rise to any suspicion that *criminal* activity is afoot.

### 3.    *Summary*

For the foregoing reasons, the undersigned finds that Defendant was seized without reasonable suspicion in violation of the Fourth Amendment. Accordingly, the objections to Judge Scoles's legal conclusions are overruled. The undersigned shall adopt the Report and Recommendation's legal conclusions.

## V. CONCLUSION

In light of the foregoing, the court **ORDERS**:

(1)    The Objections (docket no. 26) are **SUSTAINED IN PART AND OVERRULED IN PART**;

(2)    The Report and Recommendation (docket no. 19) is **ADOPTED AS MODIFIED**; and

(3)    The Motion (docket no. 9) is **GRANTED**.

(4)     The period between the filing of Defendant's Motion and the filing of this Order is excluded from calculation under the Speedy Trial Act. 18 U.S.C. § 3161(h)(1)(D) (excluding delay resulting from the filing of any pretrial motion through the conclusion of the hearing thereon); 18 U.S.C. § 3161(h)(1)(H) (excluding "delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court").

**IT IS SO ORDERED**.

**DATED** this 13th day of May, 2010.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA